Good morning, Your Honors. My name is Michael Waxman. I'm here on behalf of the Plaintiff Appellant. I'm from Portland, Maine. The law in this area involving use of lethal force to stop a fleeing suspect has been clear for thirty years, since Tennessee v. Garner was decided. A police officer may not use lethal force to stop a fleeing suspect unless that fleeing suspect poses an imminent danger of death or serious bodily injury to the shooting officer or to somebody else in the world. This case is unusual in that we have a videotape that shows pretty much everything. I think there was a videotape that showed portions of the case in Scott v. Harris, but this case really shows pretty much everything. And what it shows is that when my client was fleeing, he was not posing an imminent danger of death or serious bodily injury to anybody, not to the shooter, Officer Miller, not to his partner, I'll say, Officer Schertz, or to anybody else in the world. So in order to prevail, as they have, as the defendant did at the trial level, they would have to show that the officer, his belief that Mr. Officer Schertz was in the path of the vehicle was a reasonable mistake. So the qualified immunity analysis is, could a reasonable officer in Officer Miller's shoes, the shooter, could he believe that Officer Schertz was in the path of the vehicle? And with the videotape, the answer that I think this court and any jury would come up with is no. And the reason I say that is because we have to look at what a reasonable officer is. It's a little bit like the reasonable prudent person that we in control of his faculties, making good judgments, has the use of his eyes, including peripheral vision, and his tactile senses. And I'm assuming you've all seen the videotape. You know if I'm Officer Miller and the car is heading out in that direction, but Officer Schertz is remarkably close to Officer Miller. I mean, it looks as if they're touching. It can't be more than a foot apart. Officer Schertz is a little bit farther away from the car. Officer Miller is between the car and Officer Schertz. It is inconceivable that a reasonable officer could not understand either exactly where Officer Schertz is or that Officer Schertz transported himself in a matter of less than a second to 20 feet away in front of a car. There's no Star Trek beaming up apparatus being used here. It would be inconceivable for a reasonable officer to think that the officer in one second and backed him into the left less than a foot away, somehow in the context of less than a second, became in the path of the vehicle. And that's, I think, what would have to be the case for there to be a decision that qualified immunity should be granted here. And that's simply not what happened. I just want to back up. As I saw the tape, the second officer, who's clearly not in the path of the car at the moment of the shooting, appears to have been where the car is at the time of the shooting prior to that time. That's correct, your honor. There was a point at which, and you saw the tape, they sort of drew his weapon. That was Officer Miller. And then Officer Schertz came out of his other cruiser and was to his left. And you're right. At one point, it did seem as if he, Officer Schertz, that is, did move in front of the vehicle, at which point, if you're looking closely at the tape, you see the vehicle stop. Then Officer Schertz moves back, which then allows my client, who's not behaving well, I'll give you that, it allows him then to move the car around and accelerate away. There is a point at which he is in front of the vehicle, but he steps away and closer to Officer Miller. But can you tell from the tape that the officer who did the shooting knows he stepped away? Can I tell that he knows that? I mean, I don't see a wink, you know, between the two officers. I guess the answer to that is no, but it's hard to imagine that a well-trained officer dealing with what is something they get trained about, using lethal force to deal with a fleeing suspect, it's hard to believe that he would, with his faculties working, not understand where his partner is. And frankly, maybe it's just me, but why are you shooting your gun in a residential neighborhood if you don't know where your partner is? Especially if the person in the car isn't threatening you in that very moment. That seems to me to ricochet and hit your partner. And by the way, it's unlike the case, I think it was the Taveras case, the McGrath v. Taveras case. In that case, the partner, in shots three and four, remember the first two shots, the motorist was coming towards the officer and he shot, but then shots three and four, the justification for the shooting was that he thought his partner or the other officer was to the right and in the path of the vehicle, and there was no way to dispute that in the record, which distinguishes this case. But in that case, the partner officer said that he had taken some kind of cover position, that he had, you know, I don't know what it was exactly, but he had taken some position that permitted the shooting officer to go ahead and feel obliged to use his weapon if necessary and he wouldn't be in danger. That's not at all what happened here. I guess it's the phrase you just used that's the thing that I'm trying to figure out how to think about it, which is you said in the Taveras case that the officer thought the other officer was in harm's way and there was nothing in the record that showed you that wasn't true. Correct. But I guess I'm just wondering how different is that on your account from this case in the sense that although the record shows from the tape that he was not in fact in the path, what in the record shows that it would be unreasonable for the officer to have thought he was in the path, given that he had previously been in the path of the car? I just think common sense, quite frankly, and looking at the actual video tape. This man would have had to transport himself 20 feet. No, no, no. I know he's not in the path. We know he went from being in the path to not being in the path. The issue is did the officer know that he was in the path? And I guess what I'm saying, what in the record indicates to us that we could say it's clear he did or it's clear he didn't? Getting inside of his head is very difficult to do. I will say that if this case gets to a jury, the jury would understand because they'd have his report that he filed. He says nothing in the report about justifying the shooting because of fear for this guy, Officer Church. There's nothing in his report about that. All it says is that he felt the fear that he would be sucked under the car. When I deposed him, I sort of was smiling at that because it sounded as if he thought the car was like a locomotive going 100 miles an hour, creating suction. His report doesn't mention the other officer? In the report, justified talking about the shooting, he does not say, I shot my weapon because I was fearful for Officer Church. It merely says he thought he'd be sucked under the vehicle. When he testified at deposition, he clarified that and said, well, I was – two reasons. I was also fearful for Officer Church. But my point is that a jury, if it gets this case, will have that to consider to determine what's reasonable. And as I thought about this case for today, I thought, I'm not sure we necessarily have to get into the subject of – Are you saying there's a dispute of fact as to whether he – by his own accounts, he thought it? I think there's a dispute of fact about that, yes. I think there will be a dispute of fact about that. And I also think the jury could easily conclude, given how things happen in the videotape – What is the dispute of fact? What – where? What creates a dispute of fact? Well, all we have in the record that I've given you is – we don't have the officer's report. And I was thinking about that last night. I wish I had included that. We don't have – we do not have in the record the officer's report. Do you have the officer's deposition? We have his deposition only, correct. And his deposition indicates what you just said it indicates about his concern for his partner's safety. He does say that he was unaware of where his partner was or he thought his partner was in the path of the vehicle and that's why he shot him. He also said that he thought he'd be sucked under the car. And then when I asked him what he meant by that, he said, well, I was holding on to Mr. Mitchell, and if I had not let go, then I would have been dragged under the car. And I said, yes, but you did let go. And you used two hands to shoot my client, right? Well, yes. That's what the record and the deposition testimony shows. The deposition that was available to the district court, the deposition testimony, was there testimony about what was in the police report? In the deposition? Yes. I believe there was. This inconsistency that you're describing to us, is that in the record somewhere? Before you, I do not believe it's before the First Circuit Court of Appeals. Although maybe you have those depositions from the court beneath us, that it would be. I believe          And was there an issue that was filed before the court? Yes. OK. And you told me about his report, why it was filed three months after the incident, why he didn't mention that the shooting was on account of fear for his partner. And was that an issue joined before the district court? I don't believe, I don't believe that was. And I, let me sort of Take a minute. OK. Circle back to your question about what's in his mind. I don't think, initially, when you go to the jury because there's an issue of fact, and you could reach that conclusion. But I also think that, really, doing the analysis under the qualified immunity test, it's not asking subjective things. It's asking, could a reasonable officer in his position have mistakenly believed he was in the path of the vehicle? And I still say, the answer to that is no. And that's why this case ought to go to a jury. Thank you. May it please the court, I'm Mark Dunlap. I represent Officer Robert Miller in this case. And this last few minutes has taken a bit of a strange turn because I don't think there's anything in the record before this court or that was before the district court having to do with the absence of Officer Miller's fear or concern for his partner. What was in the statement of facts for the district court and what you have in the appendix here is these statements from Officer Miller. He was concerned, I think if you've seen the earlier with the plaintiff, but what Miller said in his deposition and in the statement of facts, he was afraid for Schertz because he thought Schertz was in the line of where the car did or might go. He was in fear for himself because he had just been dragged, was concerned, didn't know what this man was going to do. And he was concerned for what might happen if he sped out into the street again. He was concerned for other motorists, pedestrians who might be out there. Remember, this immediately followed a high, first a special part of Portland at speeds approximating or actually exceeding 65 miles an hour at some places. And you'll see in the tape, in some places there are cars parked on both sides of the street and Mr. Mitchell is going down the street at an extremely high rate of speed. And I think the officer justifiably was concerned at what might happen in addition to himself and to Officer Schertz if this man were to head back out the street and speed off again. He had, as you can hear on the tape, he squeals his tires. So he is putting his foot down on the accelerator extremely quickly and extremely hard. I think my job here today is to wrap myself in Judge Torreson's opinion to the best I can. I think she's totally correct in the qualified immunity analysis that there the constitutional violation in a situation like this has not been clearly established such that a regular officer on the street would know for a fact that if he did what Officer Miller did that he was certainly violating a constitutional right. Not only has that not been clearly established, it was not clearly established as a BROSO. It was not clearly established as of this very recent Supreme Court case, Plumhoff. And there's been nothing in between the facts that led to the Plumhoff decision which happened in 2004 and our case in 2011. In that seven year span, there has not emerged a robust consensus of opinions that this was, that would allow it to be called clearly established. In fact, the cases that I cited have gone the other way. Every case that we've found in that seven year period which has some similarities, and I was surprised in doing the research for the summary judgment how many of these types of cases there actually turn out to be in the country. The cases that we found are cases where it was either found to be no constitutional violation or the law was not clearly established. Attorney Waxman has not. There's a test which is enunciated, I guess it's in Plumhoff, that we then state again in McGrath where in order to overcome the qualified immunity barrier for the plaintiff, they need to show it's materially distinguishable from BROSO? Yes. And that's an independent, in other words, it's written as if you can show a material distinction from BROSO, then you would survive summary judgment on the qualified immunity issue. Yes. So I guess I take the point about the second officer and the concern in the deposition that the second officer was in danger and that that was the basis for the shooting. If we set that aside for a second, can I just run through three possible distinctions from BROSO and you tell me why they're not material or why they're not distinctions? The first is, as I see the tape, there's no actual person proximate, a pedestrian, etc., who the officer would know is in the immediate vicinity, would have sort of imminent reason to fear might be at harm. The second would be the chase, though it's at a high rate of speed, does seem less, there's less cars that are being passed, etc., than was the case in BROSO itself. And then the third is just on the tape, at the moment of the shooting, the driver does seem to be past the officer who does the shooting, as opposed to coming at him as in McGrath or something. So just those three distinctions. I take the point that none of that may matter if one were of the view that the deposition testimony that he feared for the safety of the second officer was a basis for concluding it. But just setting that aside for a second, what do you make of those three possible distinctions from BROSO? Well, there are certainly distinctions. I would say the cars passing is a distinction in some respects without a difference for constitutional analysis, because this happened at, I think it started at 4.40 a.m., which on the one hand meant that there were very few people on the streets and cars not moving in the way they were moving around in BROSO. On the other hand, however, it makes it even more unexpected if someone is out and someone is going to be either driving or on the streets, that somebody would be coming through at 65 miles an hour at 4.40 a.m. So for me, the third distinction is we have expert testimony or expert affidavit in this case about not only what the officer felt what he testified to, but our expert went into this whole psychology of shooting and engaging someone. And when you have someone who has not complied whatsoever and he has all the knowledge that he has about this man as a convicted felon, as a habitual offender, as a possible sexual predator, he knows he's dealing with someone who's not, as he said, not a normal traffic stop. And so he has this tunnel, what our expert testified about, or at least put an affidavit in about, he was not deposed by the way, that when you engage someone like this, your mind locks on to what is in front of you. You become less aware of the circumstances around you. So the way I see this for Officer Miller is he knew in his frame of reference at some point that Officer Schertz was in front of the car. If at the time he then focuses his opinion, that's frozen in time for him. He doesn't see or know or acknowledge, and there is information in the record that substantiates or justifies this view of what he did. So I think that the fact that there was nobody else around, no other obvious person around, is somehow militated by the fact that he does have in his mind this other person who is his colleague, his partner. I'll admit that there's no other person that is evident from anything in the tape, but again, I don't see how that changes the dynamic in this case that led to the shooting and was, that would make it unreasonable. Thank you.